## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| CRAIG CUNNINGHAM and KRISTOPHER AMBROS, individually and on behalf of all others similarly situated, | Case No. 1:19-cv-23073-JEM |
| *Plaintiffs*, | **CLASS ACTION** |
| *v.* | |
| GLOBAL PERSONALS, LLC, a Florida limited liability company, FLING.COM, LLC, a Florida limited liability company, and SHAUN GHIORZI, a Nevada individual, | |
| *Defendants.* | |

### FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Craig Cunningham and Kristopher Ambros bring this class action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") against defendants Fling.com, LLC and Global Personals, LLC and the vendor they used to send the messages Shaun Ghiorzi to stop their practice of sending unauthorized and unwanted text messages to prospective customers promoting certain dating websites and to obtain redress for all persons similarly injured by Defendants' conduct.  Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

### NATURE OF THE ACTION

1. This case challenges Defendants' practice of sending unsolicited text messages to prospective customers of certain dating websites who have never agreed to be contacted.

2. Defendants' unsolicited texts violated the TCPA and caused Plaintiff and putative

members of the Class to suffer actual harm, including the aggravation, nuisance, loss of time, and invasions of privacy that result from the receipt of such text messages, lost value of cellular services paid for, and a loss of the use and enjoyment of their phones, including wear and tear to their phones' data, memory, software, hardware, and battery components, among other harms.

3.     Accordingly, Plaintiffs seek an injunction requiring Defendants to cease sending unsolicited text messages to consumers, as well as an award of actual and/or statutory damages and costs.

<b>PARTIES</b>

4.     Plaintiff Craig Cunningham is a Texas resident.

5.     Plaintiff Ambros is a Florida resident, and resides in this District.

6.     Defendant Fling.com, LLC is a Florida company with a principal place of business in this District.

7.     Defendant Global Personals, LLC is a Florida company with a principal place of business in this District.

8.     Defendant Shaun Ghizori is a Nevada resident.

<b>JURISDICTION & VENUE</b>

9.     This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the action arises under the TCPA.

10.     The Court has personal jurisdiction over Defendants. Global Personals and Fling are incorporated in Florida and headquartered in this District. Mr. Ghizori sent the text messages at issue nationwide, including into this District as he did with Mr. Ambros. Furthermore, Mr. Ghizori entered into a contract with the remaining defendants in this District to send those text messages. For the same reasons, venue is proper in this District.

## THE TELEPHONE CONSUMER PROTECTION ACT

11.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the

telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing . . .

can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L.

No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

The TCPA Prohibits Automated Telemarketing Calls

12.     The TCPA makes it unlawful "to make any call (other than a call made for

emergency purposes or made with the prior express consent of the called party) using an

automatic telephone dialing system or an artificial or prerecorded voice … to any telephone

number assigned to a … cellular telephone service." *See* 47 U.S.C. § 227(b)(1)(A)(iii).  The

TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C.

§ 227(b)(1)(A).  *See* 47 U.S.C. § 227(b)(3).

13.     The TCPA also makes it unlawful "to initiate any telephone call to any residential

telephone line using an artificial or prerecorded voice to deliver a message without the prior

express consent of the called party". *See* 47 U.S.C. § 227(b)(1)(B).

14.     According to findings by the Federal Communication Commission ("FCC"), the

agency Congress vested with authority to issue regulations implementing the TCPA, such calls

are prohibited because, as Congress found, automated or prerecorded telephone calls are a

greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly

and inconvenient.

15.     The FCC also recognized that "wireless customers are charged for incoming calls

whether they pay in advance or after the minutes are used." *In re Rules and Regulations*

*Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003).

16.     In 2013, the FCC began requiring prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

<u>The National Do Not Call Registry</u>

17.     The TCPA also prohibits making multiple telemarketing calls to a residential telephone number that has previously been registered on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c)(5).

<u>Telemarketers Must Comply with Minimum Requirements</u>

18.     The TCPA specifically required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

19.     The FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of … company-specific "do not call systems" and "develop

4

proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." *Id.* at (c)(1)(A), (E).

20.     Pursuant to this statutory mandate, the FCC established company-specific "do not call" rules that every company engaging in telemarketing is required to comply with. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752 (Oct. 16, 1992) ("TCPA Implementation Order").

21.     The FCC found that "the company-specific do-not-call list alternative is the most effective and efficient means to permit telephone subscribers to avoid unwanted telephone solicitations." *Id.* at 8765, ¶ 23. 19.

22.     However, recognizing that an honor system would probably be insufficient, the FCC found that it "must mandate procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy." *Id.* at ¶ 24. 20.

23.     It accordingly placed the burden on telemarketers to implement and prove the implementation of their compliance procedures.

24.     These regulations are codified at 47 CFR 64.1200(d)(1)-(6).

25.     Specifically, these regulations require a company to keep a written policy, available upon demand, for maintaining a do-not-call list, train personnel engaged in telemarketing on the existence and use of its internal do-not-call list, and record and honor "do not call" requests for no less than five years from the time the request is made. 47 CFR § 64.1200(d)(1, 2, 3, 6).

26.     This includes the requirement that "[a] person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the

5

name of the person or entity on whose behalf the call is being made, and a telephone number or

address at which the person or entity can be contacted."  47 C.F.R. 64.1200(d)(4).

27.     These policies and procedures prohibit a company from making telemarketing

calls unless they have implemented these policies and procedures. 47 CFR 64.1200(d).

28.     Accordingly, all telemarketing calls violate the TCPA, unless a defendant can

demonstrate that it has implemented the required policies and procedures.

The Growing Problem of Automated Telemarketing

29.     "Robocalls and telemarketing calls are currently the number one source of

consumer complaints at the FCC." Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016),

https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC

chairman).

30.     "The FTC receives more complaints about unwanted calls than all other

complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer

Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of

1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016),

https://www.ftc.gov/system/files/documents/advocacy_documents/commentstaff-ftc-bureau-

consumer-protection-federal-communications-commission-

rulesregulations/160616robocallscomment.pdf.

31.     In fiscal year 2017, the FTC received 4,501,967 complaints about robocalls,

compared with 3,401,614 in 2016. Federal Trade Commission, *FTC Releases FY 2017 National

Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-

events/press-releases/2017/12/ftc-releases-fy-2017-nationaldo-not-call-registry-data-book-dnc.

32.     *The New York Times* recently reported on the skyrocketing number of robocall complaints and widespread outrage about illegal telemarketing. Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-riseillegal.html; *see also* Katherine Bindley, *Why Are There So Many Robocalls? Here's What You Can Do About Them*, Wall St. J. (July 4, 2018), https://www.wsj.com/articles/why-there-are-so-manyrobocalls-heres-what-you-can-do-about-them-1530610203.

33.     Even more recently, a technology provider combating robocalls warned that nearly half of all calls to cell phones next year will be fraudulent. Press Release, First Orion, *Nearly 50% of U.S. Mobile Traffic Will Be Scam Calls by 2019* (Sept. 12, 2018), https://www.prnewswire.com/news-releases/nearly-50-of-us-mobile-traffic-will-be-scam-calls-by-2019-300711028.html.

## FACTUAL ALLEGATIONS

34.     Global Personals offers a network of traditional, casual and niche dating sites.[1]

35.     This network includes Fling and its website www.fling.com.

36.     The network also includes www.SnapSext.com.

37.     The Terms and Conditions for SnapSext.com show that it is owned by Global Personals LLC:

---

[1] https://craft.co/snapshot/global-personals-llc



2

38.     This case arises from the Defendants' use of unsolicited autodialed text messages to market to prospective customers of Global Personals, LLC affiliated websites, including www.Fling.com and SnapSext.com.

39.     Global Personals relies on affiliates, such as Mr. Ghiorzi in order to generate new business for its websites.

40.     In order to generate new leads, Global Personals and/or its affiliates send out text messages *en masse* to consumers.

41.     On July 28, 2019, Mr. Ambros received the following two unsolicited autodialed text messages on his cell phone from Mr. Ghiorzi:

---

2 https://www.snapsext.com/members/info/terms/?page=terms&niche=fling-homepage



42.     The text messages that Plaintiff received directed him to visit the website

NSAMatches.com/Jw64. NSAMatches.com/Jw64 which forwarded directly to

https://www.snapsext.com/?prg=1&niche=snapsext-

homepage&id=forworkandmore&tour=1&ot=1&cmp=xdf&utm_source=forworkandmore&utm_

medium=xdf&utm_content=_noadid&utm_campaign=1.[3]

---

[3] Link exploration through Charles link checker:

  ▶ 🌐 http://nsamatches.com
  ▶ 🌐 http://www.snapsext.com

43.    NSAMatches.com itself was set-up to forward directly to Global Personals'

website SnapSext as well:



4

44.    The unsolicited, autodialed text message that Plaintiff received leads to Global

Personals' following landing page on SnapSext.com, depending on whether the user is using a

computer browser or mobile phone:

---

4 http://debug.iframely.com/?uri=http%3A%2F%2Fnsamatches.com



45.     Plaintiff has never given Global Personals or Mr. Ghiorzi consent to send automated text messages to him and has never interacted with either of those Defendants.

46.     On July 1, 2019, Mr. Ghiorzi sent two unsolicited text messages to Mr. Cunningham's cellular telephone without his consent:

---

[5] http://www.page2images.com



47.     At the time Plaintiff Cunningham received the text messages, the website

CasDates.com automatically redirected to the website Fling.com.

48.     In sending the unsolicited text messages at issue, Mr. Ghiorzi and any other vendors

used by the defendants employed the use of an automatic telephone dialing system; hardware

and/or software with the capacity to store or produce cellular telephone number to be called, using

a random or sequential number generator.

49.     This is evident from the circumstances surrounding the text messages, including

the text message's commercial content, that substantively identical texts were sent to multiple

recipients, and that they were sent from a long code,[6] which is consistent with the use of an automatic telephone dialing system to send text messages.

50.     In response to receiving Fling's text messages, Plaintiff Cunningham requested a copy of Fling's internal do not call policy and was told that one does not exist.

51.     As such, all calls to putative class members was made without the existence of a Do Not Call Policy.

52.     The calls were made to residential lines.

53.     Indeed, the nature of the solicitations were from a business to a private consumer and were not addressed or intended for any businesses.

54.     Mr. Ambros' number was listed on the National Do Not Call Registry and has been since October of 2009.

55.     Defendants' unsolicited text messages caused Plaintiffs actual harm.

56.     Specifically, Plaintiff Ambros estimates that he wasted approximately 1 minute reading Defendants' messages, and Plaintiff Cunningham estimates that he wasted approximately 60-120 seconds reading Defendants' messages.

57.     Plaintiffs also clicked on the hyperlinks contained within the messages.  Plaintiff Ambros spent an additional 2 minutes and Plaintiff Cunningham spent an additional 3-5 minutes on Global Personals pages attempting to determine why Defendants had texted him, and how Defendants had obtained their telephone numbers.

58.     The Plaintiffs also spent time consulting with counsel for the purposes of filing this suit.

---

[6] In fact, the telephone number used to send the text messages to Mr. Cunningham is registered to Bandwidth.com, a cloud-based telecom company that provides mass text messaging services. *See* http://www.watchyourdirt.com/w-y/904-440/t-3 (last visited July 22, 2019).

59.     Furthermore, Defendants' text message took up memory on Plaintiffs' cellular telephones, with the message taking up approximately 174 kb.  The cumulative effect of unsolicited text messages like Defendants' poses a real risk of ultimately rendering the phone unusable for text messaging purposes as a result of the phone's memory being taken up.

## GLOBAL PERSONALS AND FLING.COM'S LIABILITY

60.     For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

61.     In its January 4, 2008 ruling, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.  *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

62.     In fact, the Federal Communication Commission has instructed that sellers such as Global Personals and Fling may not avoid liability by outsourcing telemarketing to third parties such as Mr. Ghiorzi:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

> *May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

14

63.     On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers."[7]

64.     The defendants are liable for the calls initiated by Mr. Ghiorzi.

65.     The defendants hired Mr. Ghiorzi.to sell its services using telemarketing calls.

66.     The defendants knew (or reasonably should have known) that Mr. Ghiorzi was violating the TCPA on their behalf and failed to take effective steps within its power to force the telemarketer to cease that conduct.

67.     Any reasonable seller that accepts telemarketing call leads from lead generators would, and indeed must, investigate to ensure that those calls were made in compliance with TCPA rules and regulations.

68.     The defendants also controlled the calling conduct of Mr. Ghiorzi by:

     (1) Instructing him on the amount of leads they will accept; and

     (1) Dictating the specific content offered.

69.     Mr. Ghorzi is an affiliate of the Defendants.

70.     Defendants' affiliates are paid between $25 - $45 depending on the kind of membership that is solicited.

71.     Defendants affiliates send out autodialed text messages in order to solicit memberships for Defendants' websites.

72.     Both Defendants and its affiliates benefit financially from the unsolicited text

---

[7]     *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd 6574, 6574 (¶ 1) (2013) ("May 2013 FCC Ruling").

messages that Defendants' affiliates send out.

73.     Consumers are complaining online about receiving text messages from

defendants. For example, one consumer complained that, "Although it says that it is a landline

number, I received a text message from this number. It said I could get laid with many girls

whom only want to have sex, but only if I signed up for their websites."[8]

74.     Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence

of these kinds of relationships . . . through discovery, if they are not independently privy to such

information." *Id.* at 6592-593 (¶ 46).  Evidence of circumstances pointing to apparent authority

on behalf of the telemarketer "should be sufficient to place upon the seller the burden of

demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was

acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

## CLASS ACTION ALLEGATIONS

75.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(b)(2)

and 23(b)(3) on behalf of himself and all others similarly situated and seeks certification of the

following Classes:

> **Automated Texting Class:** All persons who, on or after four years prior to the
> filing of the complaint, (1) were sent a text message to their cellular telephone
> number (2) by Mr. Ghiorzi or another affiliate of the defendants (3) using the same
> or similar dialing system used to send the text messages to the Plaintiffs.
>
> **National DNC Class**
>
> All persons who, on or after four years prior to the filing of the complaint, (1) were
> sent a text message to their residential telephone number (2) by Mr. Ghiorzi or
> another affiliate of the defendants (3) at least two telephone solicitation calls during
> a 12 month period (4) to a number that had been listed on the National Do Not Call
> Registry for at least 30 days prior to the first call.

---

[8] https://info.scamcallernumber.com/757-217-7990

**Internal DNC Class**: All persons in the United States who from four years prior to the filing of the complaint, (1) were sent a text message to their residential telephone number by or on behalf of defendants, (2) more than two times in a 12-month period (3) for substantially the same reason defendants sent text messages to Plaintiffs.

76.     The following individuals are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, its subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiffs' attorneys; (4) persons who properly execute and file a timely request for exclusion from the Classes; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) persons whose claims against Defendants have been fully and finally adjudicated and/or released. Plaintiffs anticipate the need to amend the class definitions following appropriate discovery.

77.     **Numerosity**: The exact size of the Classes is unknown and unavailable to Plaintiffs currently, but it is clear that individual joinder is impracticable. On information and belief, Defendants sent unsolicited text messages to thousands of individuals who fall into the Class definition. Class membership can be easily determined from Defendants' records.

78.     **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs are a member of the Classes, and if Defendants violated the TCPA with respect to Plaintiffs, then it violated the TCPA with respect to the other members of the Classes. Plaintiffs and the Classes sustained the same damages as a result of Defendants' uniform wrongful conduct.

79.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes

include, but are not necessarily limited to the following:

a)    How Defendants gathered, compiled, or obtained the telephone numbers of Plaintiffs and the Classes;

b)    Whether the text messages were sent using an automatic telephone dialing system;

c)    Whether Defendants maintained a written "do not call" policy;

d)    Whether the Defendants identified itself in its text message marketing;

e)    Whether Defendants trained employees or agents engaged in telemarketing on the existence and usage of any "do not call" policy;

f)    Whether Defendants sent some or all of the text messages without the consent of Plaintiffs and the Classes; and

g)    Whether Defendants' conduct was willful and knowing such that Plaintiffs and the Classes are entitled to treble damages.

80.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions. Plaintiffs have no interest antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs.

81.    **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes, and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' practices challenged herein apply to and affect the members of the Classes uniformly, and Plaintiffs' challenge of those practices hinges on Defendants' conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

82.    **Superiority**: This case is also appropriate for class certification because class

18

proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given that joinder of all parties is impracticable. The damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendants' misconduct. Even if members of the Classes could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

**FIRST CAUSE OF ACTION**
**Violation of 47 U.S.C. § 227**
**(On Behalf of Plaintiffs and the Internal DNC Class)**

83.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 82 of this complaint and incorporate them by reference.

84.    Defendants placed two or more telemarketing calls to Plaintiffs' and Internal DNC Class Members' residential telephone numbers.

85.    Defendants did so despite not having a written policy pertaining to "do not call" requests.

86.    Defendants did so despite not identifying themselves in their text message marketing.

87.    Accordingly, Plaintiffs and Internal DNC Class Members are entitled to an award of up to $1,500 per TCPA violation, pursuant to 47 U.S.C. § 227(c)(5).

## SECOND CAUSE OF ACTION
### Violation of 47 U.S.C. § 227(b)
### (On Behalf of Plaintiffs and the Automated Texting Class)

88.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 82 of this complaint and incorporates them by reference.

89.    Defendants and/or their agents transmitted text messages to cellular telephone numbers belonging to Plaintiffs and the other members of the Automated Texting Class using an automatic telephone dialing system.

90.    These text messages were sent without the consent of Plaintiffs and the other members of the Automated Texting Class.

91.    Defendants have therefore, violated 47 U.S.C. § 227(b)(1)(A)(iii), entitling Plaintiffs and Automated Texting Class Members to an award of up to $1,500 in damages per TCPA violation.

## THIRD CAUSE OF ACTION
### Violation of 47 U.S.C. § 227(c)
### (On Behalf of Plaintiff Ambros and the Do Not Call Class)

92.    Plaintiff Ambros repeats and reallege the allegations of paragraphs 1 through 82 of this complaint and incorporates them by reference.

93.    Defendants violated 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2) by initiating multiple solicitation calls within a 12-month period to residential telephone numbers despite their registration on the National Do Not Call Registry, without signed, written prior express invitation or permission.

94.    The Defendants' violations were negligent and/or willful.

20

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes, pray for the following relief:

a)  An order certifying this case as a class action on behalf of the Classes as defined above, and appointing Plaintiffs as the representative of the Classes and their counsel as Class Counsel;

b)  An award of actual and/or statutory damages and costs;

c)  An order declaring that Defendants' actions, as set out above, violate the TCPA;

d)  An injunction requiring Defendants to cease all unsolicited text messaging activity, and to otherwise protect the interests of the Classes; and

e)  Such further and other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs request a jury trial.

Dated:  September 25, 2019.

*/s/ Avi R. Kaufman*
Avi R. Kaufman (FL Bar no. 84382)
kaufman@kaufmanpa.com
Rachel E. Kaufman (FL Bar no. 87406)
rachel@kaufmanpa.com
KAUFMAN P.A.
400 NW 26th Street
Miami, FL 33127
Telephone: (305) 469-5881

Stefan Coleman
law@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, P.A.
201 S. Biscayne Blvd, 28th Floor
Miami, FL 33131
Telephone: (877) 333-9427
Facsimile: (888) 498-8946

*Attorneys for Plaintiffs and the putative Classes*